UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| LEAFGUARD OF KENTUCKIANA, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 5: 15-237-DCR |
| V. | ) ) | |
| LEAFGUARD OF KENTUCKY, LLC, et al., | ) ) ) | **MEMORADUM OPINION AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Plaintiff LeafGuard of Kentuckiana, Inc.'s ("LeafGuard of Kentuckiana") motion for a restraining order and temporary injunction.[1] [Record No. 1, Attachment No. 2, p. 4]  The request for injunctive relief will be denied because the plaintiff has not demonstrated that it is entitled to this remedy, pending a decision on the merits of its claims.

# I.

Defendant Englert, Inc. ("Englert") is corporation organized under New Jersey law with its principal place of business located in that state.  Englert manufactures and sells a

---

[1]      The original motion for injunctive relief was filed in state court.  Following removal, Rule 65 of the Federal Rules of Civil Procedure is applicable to this claim for relief.  *See Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98, 102 (6th Cir. 1991) (Because a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held," it is a procedural issue, governed by federal law.)   Under the federal rules, only two forms of injunctive relief are available: a temporary restraining order and a preliminary injunction.  Rule 65, Fed. R. Civ. P. 65.  And because notice has been given to the adverse parties and a hearing has been held with all parties either in attendance or represented by counsel, the motion is addressed under Rule 65(a) as one seeking entry of a preliminary injunction.

patented leaf-rejecting, seamless gutter system known as the "Englert LeafGuard Gutter System."   LeafGuard of Kentuckiana is a closely-held Kentucky corporation with its office located in Lexington, Kentucky.   John Conley is the primary owner of the company's business operations.   LeafGuard of Kentucky, LLC ("LeafGuard of Kentucky") is a limited liability company, having its principal place of business located in Indianapolis, Indiana. Defendant John Chambers is the sole member of that entity.  [Record No. 1]

Todd Perry is the office manager for John Conley and is responsible for the day-to-day operations of LeafGuard of Kentuckiana.  [Record No. 16; Transcript of the 8/25/15 Hearing]  M. Scott Mattmiller is an attorney practicing with the Lexington, Kentucky firm Mattmiller Crosbie, PLLC, and previously with the firm Bullock & Coffman, LLP.  At times relevant to this action, Mattmiller represented the business interests of both Conley and Chambers. [2]

On January 1, 2003, LeafGuard of Kentuckiana and Englert entered into Distributor Agreement which allowed the plaintiff to manufacture, sell, and install Englert's patented LeafGuard gutter system.  [Record No. 1, Attachment No. 1, Ex. A, Sec. I]  The Distributor Agreement identified the plaintiff's sales territory as specific counties in Kentucky and Southern Indiana.  *Id.*  In part, Englert agreed to provide supplies, training, and technical and marketing assistance to LeafGuard of Kentuckiana.  *Id.* at Sec. IV.  In return, LeafGuard of Kentuckiana was required to purchase at least one rollformer machine from Englert at a price set in Englert's then current price schedule for the equipment.  *Id.* at Sec. VI (B).

---

[2]      During the August 25, 2015 hearing, attorney Mattmiller was careful to avoid disclosing protected attorney-client communications.

In addition to the rollformer machine, LeafGuard of Kentuckiana was required to purchase coil and other accessories used to manufacture the guttering system from Englert according to distributor pricing, terms and conditions in effect at the time of sale. *Id.* at Sec. VI (D). The Distributor Agreement also provides in Section VIII that LeafGuard of Kentuckiana is required to pay discounted royalties calculated according to the lineal footage of coil purchased from Englert. Part of the royalty provision of the agreement specifically provides for minimum annual royalty payments and outlines the manner in which such payments are to be invoiced to and paid by the distributor.

### B. Minimum Annual Royalty

In the event Distributor fails to meet the Annual Sales Target for any Contract Year as specified in Exhibit D annexed hereto, Distributor shall nonetheless pay Englert a minimum royalty as if the Annual Sales Target for such Contract Year had been met. Such minimum royalty shall be calculated at $0.40 per lineal foot if Distributor purchased its requirements of Coil and Accessories from Englert during such Contract Year, and @$.80 per lineal foot if Distributor did not purchase it requirements of Coil and Accessories from Englert during such Contract Year. In the event Distributor fails to meet the Annual Sales Target for any Contract Year and/or pay such minimum royalty, Englert shall have the right to terminate this Agreement in accordance with Section XI, Subsection B, Paragraph 1 hereof.

### C. Determination of Royalties Payable

Englert shall invoice Distributor for royalties on a weekly basis based on Distributor's weekly purchases of Coil and Accessories. All royalties shall be exclusive of any cash or other trade discounts. Distributor shall also submit to Englert a monthly usage report, substantially in the form of Exhibit I annexed hereto, on or before the fifth day of each calendar month, to verify Distributor's usage of Coil. Such report shall state the (i) opening and closing inventories of Coil for the preceding calendar month, (ii) the quantity of lineal feet of Coil purchased during such month, and (iii) the quantity of lineal feet of Coil rollformed through the Machine during such month.

### D.  **Payment Terms**

Unless otherwise provided in Englert's terms and conditions of sale, payment terms for all royalties, and for all Coil and Accessories purchased hereunder, shall in each case be net thirty (30) days from date of invoice.

*Id.* at Sec. VIII.  Exhibit D to the Distributor Agreement (referenced above) provides annual sales targets of 75,000 lineal feet for the first year of the contract and 75,000 lineal feet for the second and each subsequent year that the contract remained in effect.

After the Distributor Agreement's initial two-year term, the contract would renew for succeeding two-year periods unless either party gave at least sixty days' notice of its intent to terminate the contract.  *Id.* at Sec. XI (A).  It appears that LeafGuard of Kentuckiana's performance under the Distributor Agreement was satisfactory for a number of years.  As a result, the contract renewed without incident for several consecutive two-year terms.

Under the Distributor Agreement, Englert possessed the right to terminate the contract at any time if the plaintiff failed to pay royalties or attain its annual sales target.  *Id.* at Sec. XI (B).  Relevant provisions of the agreement regarding its term and termination provide:

### A.  **Term**

Subject to Subsections B and C of this Section XI, this Agreement shall commence on the date first written above, shall continue in effect for a period of two years (the "Initial Term") and shall continue thereafter for succeeding two (2) year periods (each a "Renewal Term") (the Initial Term and the Renewal Term(s) are also referred to herein collectively as the "Term"), unless earlier terminated by either party upon at least sixty (60) days prior written notice to either party effective the end of the Initial Term or a Renewal Term, as the case may be, or upon such greater amount of prior written notice as may be required under applicable federal or state law.

**B. Termination**

1.  Termination for Breach-Right to Cure.  Englert shall have the right to terminate this Agreement at any time in the event that Distributor materially breaches this Agreement, and Distributor has not cured such breach with[in] thirty (30) days following written notice thereof or ten (10) days following written notice thereof with respect to any failure by Distributor to pay royalties or other payments due Englert hereunder or, in the event such breach is not susceptible of cure within such thirty-day period, has not promptly commenced and continued diligently thereafter until completion of such cure.

2.  Termination for Breach-No Right to Cure.  Notwithstanding Paragraph 1 of this Subsection B, Englert shall have the right to terminate this Agreement forthwith in the event of any breach by Distributor or its obligations set forth in Section VI, Subsection O, or upon Distributor's failure to attain any Annual Sales Target.

*Id.* at Sec. XI. (A.-B.).

As previously noted, the Distributor Agreement apparently remained in effect without significant incidents until sometime in 2014.  According to testimony presented by the plaintiff during the August 25, 2015 hearing, during 2014, Englert tendered to its distributors a document captioned, "Estoppel Certificate and Mutual Release Agreement."  [*See* Plaintiff's Exhibit 4 from the 8/25/15 Hearing.]  However, John Conley, the sole owner and operator of LeafGuard of Kentuckiana, testified that he believed the document only pertained to issues involving undelivered supplies and defective products, and not to Conley's annual sales deficit and resulting royalty payments.

Q.   And what was the purpose of this agreement, if you can tell the Court?

A.   To remove them from any claims of materials and products that were being shipped and produced.

Q.   And what did that relate to?

-5-

A.     We had problems with shipping, the delivery of orders, and there was some defective parts of the product that we were trying to install that wouldn't work.

**       **       **

Q.     Okay.  And is it your understanding that you released any claims that you would have had for failure to deliver products or delivering improper products, things of that sort?  Is it your understanding that Englert would have waived all claims against you or other dealers as of that time?

A.     Yes.

Q.     And did you understand that to include any claim that they had with respect to linear feet?

A.     No.

Q.     Pardon me?

A.     It's not – it's not in the estoppel.

[*See* Record No. 16; Transcript of the 8/25/15 Hearing, p. 41, 42.]

Notwithstanding Conley's testimony, it appears that the attorneys representing LeafGuard of Kentuckiana at various times dispute whether past-due royalties were released through this document which is dated September 11, 2014.  However, that document defines "Claims" to include:

> any and all causes of action, suits, claims, demands, damages, judgments, losses, penalties, expenses (including, but not limited to, reasonable attorney's fees), costs, settlements and liabilities whatsoever known or unknown, liquidated or unliquidated, fixed, contingent, direct or indirect, at law (whether statutory, regulatory, civil, common or otherwise) or in equity for, upon or by reason of any matter, fact or thing whatsoever from the beginning of time through the effective date, with the exception of:   (1) any claims for indemnification as provided in any Distributor Agreement, (2) amounts owing and due as described in Section 2(d) below, and (3) any obligations arising out of any Distributor Agreement or the relationship between or among the

-6-

Englert Parties and the Distributor Parties which accrue subsequent to the Effective Date.

[*See* Plaintiff's Exhibit 4 from the 8/25/15 Hearing.]

Further, Section 2(d) which is referenced in the "Claims" definition of the Estoppel Certificate and Mutual Release contains an acknowledgement by the distributor (*i.e.*, LeafGuard of Kentuckiana) that "there are no amounts currently due and owing from [it] to Englert, other than amounts due to Englert arising in the ordinary course of business for products sold and services provided to [it] by Englert." The language of this document tends to support Conley's testimony that the parties did not intend for past-due royalty payments to be released.

Conley acknowledges that LeafGuard of Kentuckiana did not meet its lineal footage requirements in 2012, 2013, and 2014. However, he contends that various representatives of Englert were aware of this failure and represented that they would give LeafGuard of Kentuckiana an opportunity to turnaround the business. Correspondence introduced by the parties during the August 25, 2015 hearing confirms that such representations were, in fact, made. The plaintiff asserts, however, that the various accommodations were not legitimate offers of help. Instead, it believes that Englert's true intent was to take over the territory covered by the Distributor Agreement with LeafGuard of Kentuckiana.

LeafGuard of Kentuckiana's position is perhaps best summarized by the following exchange during the testimony of Mattmiller and counsel for the plaintiff:

> Q.     Given what you testified here today, do you believe that Englert in good faith negotiated with you with respect to the transaction involving the transfer of the Conley territory to Mr. Chambers?

A.      No.  I believe it was all a canard from the  -- from the very beginning it was a pretext that there was going to be a predetermination that the territory was going to be absorbed by Englert, and that determination was made and remains to this day.

And regardless of the contract or the dealership agreement between the parties, Englert was going to find a way to prevent that from happening.

Q.      And with respect to any performance of any alleged linear feet requirement, based on your involvement in this situation, do you believe that Mr. Conley had a fair, a reasonable opportunity to meet that given conditions proposed – imposed by Englert?

A.      Well, of course, he didn't.  That is the first thing that I said to Englert.  This is – I said, that's a pretext.  It's a – it's an invented thing that you are on the one hand saying we want to assist you and provide you with this extended deadline.  Oh, but guess what, we're extending the deadline through three of the coldest winter months of the year when no one sells any gutters, period.

Q.      Really, that would be –

A.      It was nonsensical.

Q.      Are you saying – did you – did you conclude that they were presenting what would be within the industry and within your understanding commercially unreasonable terms?

A.      That's how I phrased it, and that's how I explained it.

And so, you know, those were consistent theories throughout the negotiations with Englert, that it was acting in a commercially unreasonable fashion, that it was intentionally interfering with the contractual and business relationships of these two parties who I represented, and it was not in good faith – it was not dealing in good faith, and that we thought that it was actionable, and that was consistent.

[Record No. 16; Transcript of 8/25/15 Hearing at pp. 197-98.]   Various letters from

Mattmiller to representatives of Englert were introduced during the August 25, 2015 hearing

which support these assertions and claims.  [*See* Plaintiff's Exhibits 18, 23, 25, 28, 29, 31,

33, 34, 37, 38 41 and 44 from the 8/25/15 Hearing.]  The Court notes, however, that Englert

-8-

retained the right under the Distribution Agreement to forgo assistance and extensions and, instead, end the contractual arrangement with LeafGuard of Kentuckiana pursuant to the termination provision set out above.

Other letters presented as exhibits during the hearing support Englert's position that, while it was willing to give LeafGuard of Kentuckiana more time to meet its sales requirements, it did not intend to waive any contractual rights under the Distributor Agreement in doing so.  These exhibits include:

- An October 22, 2014 letter from Courtney Meeker, General Counsel for Englert, to Conley in which Meeker (i) references a conversation involving Conley and other representatives of Englert; (ii) cites the likelihood that LeafGuard of Kentuckiana will be unable to meet it sales target for 2014; (iii) cites as grounds for termination of the Distributor Agreement the fact that LeafGuard of Kentuckiana had failed to meet minimum sales targets for the two prior years; (iv) noted that Englert would reevaluate LeafGuard of Kentuckiana's compliance with the terms of the Distributor Agreement in six months (incorrectly referred to as February 2015); and (v) reserved Englert's right to terminate the agreement based on LeafGuard of Kentuckiana's breach;

- A December 16, 2014 letter from Meeker to Conley in which Meeker (i) attempts to clarify the status of the parties' relationship and (ii) clarifies Englert's position that it did not intend to terminate the Distributor Agreement based on underperformance, provided that LeafGuard of Kentuckiana would sell and install

at least 30,000 linear feet of product over the six-month period running from October 1, 2014 through March 30, 2015;

- A December 29, 2014 letter from Meeker to Conley in which Englert refused to extend the six-month grace period discussed in earlier correspondence;

- A February 9, 2015 letter from Meeker to counsel for LeafGuard of Kentuckiana in which Meeker (i) provides formal notice that LeafGuard of Kentuckiana was in breach of the Distributor Agreement by virtue of its failure to meet minimum sales targets (*i.e.*, sales of 30,920 linear feet in 2014) and (ii) again confirms that Englert will not extend the six-month grace period beyond March 2015;

- A March 30, 2015 letter from Steve Bradley of Englert in which Bradley acknowledges a recent order of coil and accessories from LeafGuard of Kentuckiana but states that the order will not be filled because LeafGuard of Kentuckiana had purchased less than 13,000 linear feet of coil since October 1, 2014, and, therefore, would be unable to meet its purchase requirement during the six-month grace period referenced in earlier correspondence.

[*See* Plaintiff's Exhibit Nos. 5, 7, 9, 24 and 20 from the 8/25/15 Hearing.]  Based on the evidence submitted to date, these documents effectively refute the plaintiff's assertion that Englert waived its right to terminate the Distribution Agreement based on statements that Englert's representatives (Joe Turovac and Steve Bradley) allegedly made during and after meetings in July 2014.

In short, the correspondence exchanged during late 2014 and early 2015 leads to the inescapable conclusion that, unless LeafGuard of Kentuckiana's business improved

dramatically by April 1, 2015, the Distribution Agreement would be terminated according to explicit terms of the contract.  Aware of this likely outcome, Conley approached Defendant John Chambers regarding the sale of his franchise covering parts of Kentucky and Indiana. At the time of these discussions, Chambers held a separate franchise for other territories.

On March 12, 2015, the plaintiff entered a Purchase Agreement with Chambers' company, LeafGuard of Kentucky.  [Record No. 1, Attachment No. 1, Ex. B]  During their initial discussions, it does not appear that Chambers was aware of the ongoing dispute involving LeafGuard of Kentuckiana and Englert or aware of the possibility that the plaintiff's Distributor Agreement was in danger of being terminated within days.

The Purchase Agreement purported to convey all the plaintiff's assets, including its franchise with Englert, to LeafGuard of Kentucky for $520,000.00.  *Id.* at Sec. 4 (a). LeafGuard of Kentuckiana and Englert agree that their Distributor Agreement gives Englert a right of first refusal to any sale of the plaintiff's franchise.  [Record No. 7, Attachment No. 2, Sec. XIV (B)]  However, they disagree regarding whether the Distributor Agreement requires Englert's consent for a sale of the franchise and corresponding assets to a third party distributor.

> Englert relies on Section XIV (A) of the Distributor Agreement, which states:
>
> Distributor shall not sell, assign, transfer or otherwise convey to any third party, all or a controlling equity interest in, or all or substantially of the assets of, Distributor, without obtaining Englert's express prior written consent …

The plaintiff counters that Section XIV (C) presents an exception to the general consent rule. Section XIV (C) provides, in part, that:

> Notwithstanding Subsections A and B of this Section XIV, Distributor shall advise Englert, but shall not be required to obtain Englert's consent, with respect to any sale, assignment, transfer, or other conveyance within the scope of the provision to any Distributor Owner and/or Distributor Operator identified in Exhibit G annexed hereto.

Further, Exhibit G, entitled "Performance Guaranty," makes no reference to other Distributor Owners and/or Distributor Operators.

Proceeding on its belief that consent was required, Englert offered its conditional consent to the sale. [Record No. 15, Ex. 35] However, the terms of Englert's offer required that LeafGuard of Kentuckiana relinquish certain assets to pay-off past due royalties. *Id.* Englert also disclosed that it would not renew the Distributor Agreement once the current two-year term ended in January of 2017. *Id.*

On June 25, 2015, Chambers gave notice that his company no longer wished to pursue the purchase of LeafGuard of Kentuckiana's territory and assets. [Record No. 1, Attachment No. 1, Ex. C] Additionally, Chambers requested the immediate return of the Escrow Deposit held by the plaintiff's attorney according to their agreement. *Id.* Because the plaintiff did not accept Englert's offer or make a formal counter-offer, Englert terminated the Distributor Agreement by letter dated July 14, 2015. [*See* Plaintiff's Exhibit 43 from the 8/25/15 Hearing.] Englert purportedly based its decision on the plaintiff's failure to cure its default. *Id.*

## II.

On August 4, 2015, LeafGuard of Kentuckiana filed suit against Englert, Inc., John Chambers, and LeafGuard of Kentucky, LLC in the Fayette Circuit Court. The action was removed to this Court on August 14, 2015. [Record No. 1, Attachment Nos. 1 & 2] The

-12-

plaintiff's Complaint alleges that Englert breached the Distributor Agreement, breached its duty of good faith and fair dealing, and tortiously interfered with the Purchase Agreement involving the sale of LeafGuard of Kentuckiana's Distribution Agreement to LeafGuard of Kentucky.  *Id.*  Contemporaneous with the filing of the matter in the Fayette Circuit Court, the plaintiff also moved for injunctive relief, seeking to prohibit Englert from terminating the Distribution Agreement while also seeking to prevent Englert from interfering with the sale of its territory and assets to LeafGuard of Kentucky under the Purchase Agreement dated March 12, 2015.  [Record No. 1, Attachment No. 2, p. 4]

Following removal, a hearing was held on August 25, 2015, regarding all motions ripe for review, including the plaintiff's request for injunctive relief.  During this hearing, LeafGuard of Kentuckiana presented the testimony of John Conley, Todd Perry and M. Scott Mattmiller in support of its request for injunctive relief.  [*See* footnote 2 at p. 2 above.]  The plaintiff also offered 47 exhibits in support of its claims.  With the exception of Plaintiff's Exhibit 16, all exhibits offered by the LeafGuard of Kentuckiana were introduced and have been considered by the Court with respect to the matters currently pending for consideration.  Additionally, the Court has reviewed and considered the matters attached to the various pleadings filed in this action.

### III.

As an initial matter, the Court notes that issuance of injunctive relief prior to a decision on the merits is an extraordinary equitable measure, characterized as "one of the most drastic tools in the arsenal of judicial remedies."  *Am. Civ. Liberties Union of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 444 (6th Cir. 2003) (internal quotation marks and

citation omitted).  For this reason, it should not be extended to cases which are doubtful or do not fall within well-established rules of law.  *See id.*

The United States Court of Appeals for the Sixth Circuit has identified the following factors to be considered when evaluating motions for injunctive relief: (1) the likelihood of success on the merits (2) whether the injunction will save the plaintiffs from irreparable injury; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).  And while each of these factors should be considered, they are not individual prerequisites.  Instead, they are interconnected elements that must be balanced in determining whether preliminary injunctive relief is warranted.  *See Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998).

It is also noteworthy that the plaintiff bears the burden of proving that injunctive relief is proper.  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  However, the Court also recognizes that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Certified Restoration*, 511 F.3d at 542 (internal quotation marks omitted).  While a plaintiff is not required to prove its case in full to obtain injunctive relief, the proof needed "is much more stringent than the proof required to survive a summary judgment motion."  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).  But, "'it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as make them fair ground for litigation and thus for more deliberative investigation.'"  *Certified Restoration,* 511 F.3d at 542 (quoting *In re DeLorean*

-14-

*Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

### A.   Success on the Merits

Although a party seeking injunctive relief "is not required to prove his case in full," it must demonstrate "more than a mere possibility of success" on the merits. *Certified Restoration*, 511 F.3d at 543 (internal quotation marks and citation omitted). Here, while the plaintiff has demonstrated a possibility of success, it has not proven that its likelihood of success is particularly strong.

LeafGuard of Kentuckiana claims that Englert breached the Distributor Agreement and its covenant of good faith and fair dealing by unilaterally terminating the contract.[3] However, based on the evidence currently before the Court, the plaintiff will be hard-pressed to prove a breach at trial because the Distributor Agreement specifically allows for termination upon the plaintiff's default without notice. [Record No. 1, Attachment No. 1, Ex. A] Likewise, the plaintiff's argument that Englert's offer to cure was "commercially unreasonable" is not likely to withstand the plain language of the contract. Conley's testimony regarding his understanding of the general release signed in September of 2014 also weighs against the plaintiff's express estoppel argument. [Record No. 15, Ex. 4] Further, the plaintiff's equitable estoppel argument is undermined by evidence that Englert representatives *continuously* warned the plaintiff about the repercussion of default for months prior to termination.

---

[3]   The Distribution Agreement contains a New Jersey choice of law provision. [Record No. 1, Attachment 1, Ex. A, Sec. XV (E)] Generally, choice of law provisions are enforceable. *See Certified Restoration*, 511 F.3d at 541. However, neither party has addressed this issue.

With respect to the plaintiff's tortious interference claims, Englert argues that the Distributor Agreement required Englert's consent for the sale to LeafGuard of Kentucky. The plaintiff counters with a different interpretation of the Distributor Agreement's consent provisions.  Both parties offer legitimate explanations for their interpretation of the Distributor Agreement.  At this stage of the proceedings, the Court concludes that a jury might decide for either party at a trial on the merits.  However, proof that the plaintiff *might* prevail regarding this argument is not enough to convince the Court that issuance of injunctive relief is appropriate. In short, the undersigned concludes that the plaintiff has failed to meet its burden of establishing a *likelihood* that it will succeed on this issue.

### B.        Irreparable Injury

A plaintiff's injury is irreparable for purposes of injunctive relief analysis if the harm "is not fully compensable by monetary damages."  *Overstreet*, 305 F.3d at 578.  But because the loss of customer goodwill is often difficult to calculate, such loss may constitute irreparable injury. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 508 (6th Cir. 1992).

LeafGuard of Kentuckiana argues that it will lose its valuable reputation among its customer base if Englert continues to prevent its future completion of existing jobs.  And while the plaintiff might suffer harm from the loss of customer goodwill, it has also attempted to quantify the value of goodwill in the documents introduced during the August 25, 2015 hearing.  The Purchase Agreement that the plaintiff seeks to enforce specifically assigns the value of $303,350.00 for goodwill of the business, negating the plaintiff's claim

that monetary damages are incalculable.  [Record No. 1, Attachment No. 1, Ex. B, Sec. 7 (a)][4]

The plaintiff cites two cases from this circuit in support of its theory that the loss of goodwill of a business can support a claim for injunctive relief.  However, unlike this case, the goodwill at issue in those cases could not be assigned a monetary value based on evidence presented by the parties.  In *Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587, 590-91 (6th Cir. 2001), the plaintiff telephone carriers, supplying over ninety-percent of the local phone service in Michigan, sought injunctive relief from a recently-enacted Michigan law regulating telephone service charges.  The plaintiff feared it would lose customer goodwill if forced to recoup its losses by raising rates state-wide during the pendency of the action.  *Id.* at 599.  The telephone company's wide customer base and the broad new regulatory scheme no doubt made alleged damage to goodwill difficult to calculate, in contrast with this case where the Purchase Agreement purportedly sets a specific value for goodwill.

In *Basicomputer*, *supra*, the plaintiff employer sought to enjoin its former employees from breaching certain non-compete and confidentiality covenants in their employment agreements.  The Sixth Circuit found irreparable harm had been demonstrated where the plaintiff could only estimate the "direct" harm to the company for six to twelve months but could not measure the "unfair price situation" caused by the breaches.  *Id.* at 512.  The

---

[4]       At this stage of the proceedings, the Court finds it unnecessary to address Englert's argument that $303,350 overstates the goodwill of a business based on a contract which may be terminated at the end of a two-year term.

defendants seeking to avoid the issuance of an injunction suffered a basic lack of proof problem.  No such problem exists here.

During the August 25, 2015, hearing, the plaintiff also introduced its comprehensive profit and loss figures from 2013 and 2014.  [Record No. 15, Ex. 3]  With such evidence of past and potential future lost profits, monetary damages will likely provide an adequate remedy if the plaintiff prevails on some or all of its claims.  Thus, the plaintiff's alleged injury from Englert's claimed wrongful termination of the Distributor Agreement is not irreparable but is capable of determination in monetary terms.

With respect to Englert's alleged interference with LeafGuard of Kentuckiana's sale of its territory and assets to LeafGuard of Kentucky, a lost profits calculation can also be performed.  In the Purchase Agreement, Leafguard of Kentuckiana agreed to sell all assets of the company, including its goodwill, for $520,000.00.  [Record No. 1, Attachment No. 1, Ex. B, Sec. 4]  Again, it is not necessary at this time for the Court to address whether this is a legitimate value based on the potential length of the franchise and the possibility of termination.  However, because the contract has a monetary value that may be calculated if the plaintiff ultimately prevails, damages for interference with this purported contract could be assigned a monetary value.  Thus, the plaintiff has failed to establish that it has suffered or will suffer irreparable injury with respect to either claim.

### C.    Substantial Harm to Others

The Court also considers whether others -- including the defendants -- would suffer substantial harm from the issuance of injunctive relief.  Englert contends that it will suffer such harm if forced to continue its business relationship with LeafGuard of Kentuckiana.

-18-

For support, it observes that the plaintiff struggled to meet the demands of the Distributor Agreement for over three years. For this reason, the Court concludes that Englert would not suffer *substantial* harm by another few months of possibly low performance after years of the same. Englert also advises that it is developing plans to open an office in the disputed territory. However, at this point in the litigation, it has failed to disclose any investment it would lose if the plaintiff or LeafGuard of Kentucky were allowed to continue the distributorship until final disposition of this case. A mere setback in Englert's plans does not constitute substantial harm.

### D.       Public Interest

Non-parties will likely remain unaffected by the Court's decision on these matters. LeafGuard of Kentuckiana, Englert, and possibly LeafGuard of Kentucky all seek to sell gutter systems in the territory identified in the Distributor Agreement. Regardless of whether the Court grants or denies injunctive relief, some party to this litigation (or perhaps a third party) will likely serve those homes and businesses in Kentucky and Southern Indiana that seek to purchase a LeafGuard gutter system. At this point in the litigation, neither party has accused the other of failing to install properly-operating systems or otherwise providing deficient service to customers.[5] Thus, the public interest will not be affected by this Court granting or denying injunctive relief.

---

[5]       While some references are made to defective products in connection with the Estoppel Certificate and Mutual Release Certificate, the parties do not contend that corrective action was not taken to remedy problems identified.

**IV.**

Plaintiff LeafGuard of Kentuckiana has not demonstrated that it is likely to succeed on the merits of its claims against the defendants.  Likewise, the plaintiff has not shown that it will suffer irreparable injury if its claim for injunctive relief is denied at this stage of the proceedings.  The Court also concludes that public interest is not affected, and a balancing of harm does not weigh in favor of either party.  As a result, the Court concludes that the plaintiff has failed to meet its burden under Rule 65 of the Federal Rules of Civil Procedure of demonstrating that injunctive relief is appropriate.  Accordingly, it is hereby

**ORDERED** that the plaintiff's motion for a restraining order and temporary injunction, construed as a motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, is **DENIED**.

This 2nd day of September, 2015.

Signed By:

*Danny C. Reeves*  DCR

**United States District Judge**

-20-