UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| LEAFGUARD OF KENTUCKIANA, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 5: 15-237-DCR |
| V. | ) ) | |
| LEAFGUARD OF KENTUCKY, LLC, et al., | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

*** *** *** ***

This matter is pending for consideration of Defendant Englert Inc.'s motion to compel arbitration and stay the entire action pending arbitration. [Record No. 4] For the reasons outlined below, the defendant's motion will be granted, in part, and denied, in part.

**I.**

Defendant Englert, Inc. ("Englert") is a corporation organized under New Jersey law with its principal place of business located in that state. The company manufactures and sells a patented leaf-rejecting, seamless gutter system known as the "Englert LeafGuard Gutter System." Plaintiff LeafGuard of Kentuckiana is a closely-held Kentucky corporation with its offices located in Lexington, Kentucky. John Conley is the primary owner of the company's business operations. Defendant LeafGuard of Kentucky, LLC ("LeafGuard of Kentucky") has its principal place of business in Indianapolis, Indiana. Defendant John Chambers is the sole member of that entity. [Record No. 1]

On January 1, 2003, LeafGuard of Kentuckiana and Englert entered into Distributor Agreement which allowed the plaintiff to manufacture, sell, and install Englert's LeafGuard gutter system.  [Record No. 1, Attachment No. 1, Ex. A, Sec. I]  The Distributor Agreement identified the plaintiff's sales territory as specific counties in Kentucky and Southern Indiana.  *Id.*  After the agreement's initial two-year term ended, the parties renewed it for several consecutive two-year terms.  In 2014, Englert began to express concern about LeafGuard of Kentuckiana's failure to meet its annual sales target and pay royalties as required by the Distributor Agreement.  [*See* Plaintiff's Exhibits Nos. 5, 7, and 9 from the 8/25/2015 Injunctive Relief hearing.]  Englert representatives reminded Conley that the Distributor Agreement expressly allowed Englert to terminate the agreement if LeafGuard of Kentuckiana failed to pay the royalties it owed or attain its annual sales target.  [*See* Plaintiff's Exhibit 5 from the 8/25/2015 hearing.]

Aware that Leafguard of Kentuckiana could not meet Englert's demands, Conley approached Chambers regarding a possible sale of his franchise.  At the time of these discussions, Chambers held a separate franchise for other territories.  During their initial discussions, it does not appear that Chambers was aware of the ongoing dispute involving LeafGuard of Kentuckiana and Englert, or aware of the possibility that the plaintiff's Distributor Agreement was in danger of termination.  On March 12, 2015, the plaintiff entered a Purchase Agreement with Chambers' company, LeafGuard of Kentucky.  [Record No. 1, Attachment No. 1, Ex. B]  The Purchase Agreement purported to convey all the plaintiff's assets, including its franchise with Englert, to LeafGuard of Kentucky for $520,000.00.  *Id.* at Sec. 4 (a).

Englert and LeafGuard of Kentuckiana disagree over whether the Distributor Agreement required Englert's consent for a sale of the franchise and corresponding assets to a third-party distributor.  Regardless, LeafGuard of Kentucky maintains that Englert's consent was a condition to closing on its Purchase Agreement with LeafGuard of Kentuckiana.  [Record No. 25, p. 4]  Proceeding on the belief that consent was required, Englert offered its conditional consent to the sale.  [Record No. 15, Ex. 35]  However, the terms of Englert's offer required that LeafGuard of Kentuckiana relinquish certain assets to pay off past due royalties.  *Id.*  Englert also advised that it would not renew the Distributor Agreement once the current two-year term ended in January 2017.  *Id.*

On June 25, 2015, Chambers gave notice that his company no longer wished to pursue the purchase of LeafGuard of Kentuckiana's territory and assets.  [Record No. 1, Attachment No. 1, Ex. C]  Additionally, Chambers requested the immediate return of the escrow deposit held by the plaintiff's attorney according to their agreement.  *Id.*  Because the plaintiff did not accept Englert's offer or make a formal counteroffer, Englert terminated the Distributor Agreement by letter dated July 14, 2015.  [*See* Plaintiff's Exhibit 43 from the 8/25/15 Hearing.]

## II.

On August 4, 2015, LeafGuard of Kentuckiana filed suit against Englert, Chambers, and LeafGuard of Kentucky in the Fayette Circuit Court.  Shortly thereafter, the action was removed to this Court.  [Record No. 1, Attachment Nos. 1 & 2]  The plaintiff alleges that Englert breached the Distributor Agreement, breached its duty of good faith and fair dealing, and interfered with the Purchase Agreement involving the sale of LeafGuard of Kentuckiana's Distributor Agreement to LeafGuard of Kentucky.  *Id.*  Further, the plaintiff

asserted breach of contract claims against LeafGuard of Kentucky and Chambers and sought injunctive relief enforcing both the Distributor Agreement and the Purchase Agreement. *Id.* By Memorandum Opinion and Order dated September 2, 2015, this Court denied the plaintiff's claims for injunctive relief. [Record No. 22]

On the same day that Englert removed the case to federal court, it also moved the Court to compel arbitration and stay the entire action pending completion of arbitration between Englert and LeafGuard of Kentuckiana. [Record No. 4]

The Distributor Agreement contains the following arbitration provisions:

**XV. GENERAL**

**A.     Arbitration**

1. Dispute Resolution. The parties agree to work in good faith to resolve any issue arising out of or relating to this Agreement. If the parties are unable to resolve such issue within ten (10) days after discussions have been requested in writing by either party, the issue shall be subject to binding arbitration pursuant to Paragraph 2 of this Subsection.

2. Selection of Arbitrators. Within thirty (30) days after delivery by either party of a written request for arbitration following the expiration of the ten-day period specified in Paragraph 1 of this Subsection, the parties shall endeavor to agree upon an arbitrator to resolve the issue. If the parties are unable to agree upon such person during such thirty (30) day period, then each party shall appoint an arbitrator within fifteen (15) days thereafter, and such arbitrators shall together designate a mutually agreed upon third arbitrator with expertise in the operation of distributorships. In the event that such arbitrators fail to designate such third arbitrator within fifteen (15) days following their appointment, either party may seek judicial appointment of such arbitrator in any court of competent jurisdiction.

3. Arbitration Procedures. Arbitration shall be conducted in accordance with the Commercial Rules of the American Arbitration Association (the "Rules"), and held in New Brunswick, New Jersey or at such other location mutually agreed upon by each party and all the arbitrators. Except as may be otherwise required by law, any arbitration proceeding and the arbitrators' award shall be maintained in the strictest confidence by the parties. Each party shall pay its own costs and expenses, and the parties shall share equally the fees and

expenses of the sole or third arbitrator, as the case may be, irrespective of which party is held or perceived to be the prevailing party.

4. <u>Award</u>.  The arbitrators shall have no authority to award exemplary or punitive damages of any type under any circumstances, whether or not such damages may be available under state or federal law of [sic] under the Rules, and each party hereby waives any right it may otherwise have to recover any such damages.

5. <u>Binding Nature</u>.  Judgment may be entered on any determination by the arbitrator(s), which shall be binding upon the parties and enforceable in any federal or state court of competent jurisdiction sitting in New Jersey.

[Record No. 1, Attachment No. 1, Ex. A]

The plaintiff contends that the arbitration provision is unconscionable and, therefore,

unenforceable. [Record No. 26]  In support of its agrument, the plaintiff relies, in part, on the

following contract provision which it claims demonstrates the one-sided nature of the

Distributor Agreement:

## B.      **Right of Englert to Injunctive Relief**

Distributor acknowledges the serious and irreparable nature of any breach by Distributor of its obligations of confidentiality or non-competition under this Agreement, and the unlikelihood that Englert could achieve an adequate remedy at law, and therefore further acknowledges that, notwithstanding Subsection A of this Section XV, Englert shall be entitled to injunctive relief in the event of Distributor's breach of its obligations of confidentiality or non-competition hereunder.

[Record No. 1, Attachment No. 1, Ex. A, Section XV(B)]

Englert and LeafGuard of Kentuckiana also disagree regarding whether the

Distributor Agreement's choice-of-law provision is enforceable.  This provision states:

## E.      **Governing Law; Jurisdiction and Venue**

This Agreement shall be subject to and enforced and construed pursuant to the laws of the State of New Jersey and any lawsuit brought to enforce this Agreement shall be brought exclusively in the state or federal courts sitting in

New Jersey.  Distributor specifically submits to the jurisdiction of the state and federal courts in the State of New Jersey for these purposes.

*Id.* at Section XV(E).

Englert also requests that the entire action be stayed until arbitration is complete. [Record No. 4]  The plaintiff supports a total stay if the Court grants Englert's motion. [Record No. 26]  However, LeafGuard of Kentucky and Chambers oppose a stay because they are not subject to the Distributor Agreement's arbitration clause.  [Record No. 25]  They request that the Court allow them to file motions for summary judgment based on the condition in the Purchase Agreement that requires Englert's consent for the sale.  *Id.* According to LeafGuard of Kentucky and Chambers, such motions would resolve the plaintiff's claims against them and their counterclaim.  *Id.*  In its reply, Englert stated that it does not object to LeafGuard of Kentucky and Chambers filing a motion for summary judgment "on the discrete issue of whether a condition precedent to performance of the Purchase Agreement was unsatisfied."  [Record No. 29]

### III.

While the plaintiff and Englert disagree regarding the applicable state law, both agree that their dispute is governed, in part, by the Federal Arbitration Act ("FAA").  [Record No. 4, p. 4, n. 1 and Record No. 26, p. 4]  Under the FAA, arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  This section of the FAA "'is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.'"  *Asplundh Tree Expert Co. v. Bates*,

71 F.3d 592, 595 (6th Cir. 1995) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

When evaluating a motion to compel arbitration, the Court considers the following factors: (i) whether the parties agreed to arbitrate; (ii) the scope of the arbitration agreement; (iii) whether there are any federal statutory claims that are non-arbitrable; and (iv) whether to stay any proceedings not subject to arbitration. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). Although state law governs the interpretation of the arbitration agreement, the "liberal federal policy favoring arbitration agreements" must be taken into account even when state-law issues are presented. *Moses H. Cone*, 460 U.S. at 24. Finally, any doubts regarding the parties' intentions should be resolved in favor of arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

## IV.

Before reaching the analysis from *Stout*, the Court will address the jurisdictional issue raised by Englert who contends that the validity of the underlying contract should also be decided in arbitration. [Record No. 29] Because LeafGuard of Kentuckiana challenges the validity of the arbitration agreement and not the contract as a whole, this Court has jurisdiction over the issue. The Court will also address the parties' choice-of-law dispute.

### A.     Jurisdiction

Englert notes that the Distributor Agreement contemplates that the "[a]rbitration shall be conducted in accordance with the Commercial Rules of the American Arbitration Association." [Record No. 29 and Record No. 1, Attachment No. 1, Ex. A, Sec. XV(A)(3)] Rule 7(a) of the Commercial Rules gives the arbitrator the "power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the

arbitration agreement or to the arbitrability of any claim or counterclaim." American Arbitration Association, *Commercial Arbitration Rules and Mediation Procedures* (2013), https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004103. Accordingly, Englert asserts that the validity of the contract and the arbitration clause is a question for the arbitrator, not this Court. [Record No. 29]

Section 4 of the FAA states in part, that "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to a trial thereof." 9 U.S.C. § 4. The Supreme Court has held that section 4 requires courts -- not arbitrators -- to address any challenge to the arbitration clause itself. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). On the other hand, arbitrators may decide challenges to the validity of the contract as a whole. *Id. See also Great Earth Co.s, Inc. v. Simons*, 288 F.3d 878 (6th Cir. 2002). If a court determines that the validity of an arbitration agreement is at issue, it must apply state law to determine whether the parties actually agreed to arbitrate. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). *See also* 9 U.S.C. § 2.

Upon initial review, the plaintiff's unconscionability argument seems to suggest a challenge to the validity of the entire contract. The plaintiff labels the Distributor Agreement as an adhesion contract, arguing that the agreement's limitation of remedies demonstrates its unfair and one-sided nature. [Record No. 26] However, the plaintiff is careful to attribute unconscionability to the arbitration clause itself, rather than the whole agreement. *Id.* After all, to challenge the validity of the *entire* agreement would be undermine the plaintiff's breach of contract claim against Englert. Because LeafGuard of Kentuckiana opposes

enforcement of the arbitration clause itself, not the contract as a whole, this Court will apply state law to determine whether the arbitration agreement is valid and binding.

### B.      Choice-of-law

LeafGuard of Kentuckiana relies primarily upon Kentucky case law to support its contention that the arbitration agreement is unconscionable.  [Record No. 26]  Englert, however, maintains that the Distributor Agreement's choice-of-law provision requires application of New Jersey law to questions regarding contract formation.  [Record No. 29] Based upon Kentucky choice-of-law rules, Englert is correct.

"It is a well-accepted principle that a federal court in a diversity case must apply the conflict of law rules of the state in which it sits."  *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993).  *See also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Traditionally, Kentucky courts have been "very egocentric or protective concerning choice of law questions."  *Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355, 357 (Ky. Ct. App. 1987), *overruled on other grounds by Oliver v. Schultz*, 885 S.W.2d 699, 702 (Ky. 1994).  The Sixth Circuit has concluded, "it is apparent that Kentucky applies its own law unless there are overwhelming interests to the contrary."  *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983).  For example, in *Breeding v. Mass. Indem. and Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982), the Kentucky Supreme Court applied Kentucky law even though the insurance contract at issue specified that Delaware law would govern.  In reaching this conclusion, the *Breeding* court applied the most significant relationship test from the Restatement Second of Conflict of Laws.  *Id.*

However, in *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 400 (6th Cir. 2000), the Sixth Circuit distinguished *Breeding* and enforced a Tennessee choice-of-law

provision even though Kentucky conflict-of-law rules applied.  The Sixth Circuit relied primarily upon § 187 of the Restatement Second of Conflict of Laws which generally encourages enforcement of choice-of-law provisions.  *Id.* at 398.  Even though *Breeding* did not mention § 187, the Sixth Circuit concluded that its application was consistent with *Breeding*'s use of the significant relationship test from § 188.  The *Abrams* Court further explained,

> [s]pecifically, we do not believe that *Breeding* can be construed as broadly precluding parties from making a reasonable and binding choice as to the law that will govern their contractual relationship.  In reaching this conclusion, we begin by noting the significant distinctions between *Breeding* and the present case.  In *Breeding,* the accidental death policy and its choice-of-law clause were not the subject of any negotiations, arms-length or otherwise.  Indeed, Mr. Breeding was never even given a copy of the policy, and he had no knowledge of its terms . . . Further, even if the policy had been provided to Mr. Breeding, he would have learned only that it was to be governed by "the laws of the state of delivery of the policy." 633 S.W.2d at 719.  He would not have been specifically informed that Delaware law would apply, nor would this have been apparent from the policy language.

*Id.* at 393.

In *Geico Indem. Co. v. Crawford*, 36 F. Supp. 3d 735, 741 (E.D. Ky. 2014), the defendants argued that § 187 should not apply because the Kentucky Supreme Court did not adopt the § 187 test in *Schnuerle v. Insight Commc'ns, Co., L.P.,* 376 S.W.3d 561, 566-67 (Ky. 2012), decided after *Abrams*.  Nevertheless, this Court applied § 187 and enforced the Ohio choice-of-law clause on the basis that *Schnuerle* did not even mention § 187, and the Kentucky Supreme Court "has never expressly stated that § 187 should not be used."  *Id.* at 741 (quoting *Abrams*, 223 F.3d at 397-98).  Based on the foregoing analysis, this Court will apply § 187 and the significant relationship test from § 188 of the Restatement to determine whether New Jersey or Kentucky law is applicable.

- 10 -

When applying the most significant relationship test to a contractual dispute, Restatement Second § 188(2) directs courts to consider the following factors: (a) the place of contracting, (b) the place of negotiation, (c) the place of performance, (d) the location of the contract's subject matter, and (e) the parties' domicile, residence, nationality, place of incorporation and place of business.  Restatement (Second) of Conflict of Laws § 188(2) (1971).  The place of contracting and negotiation is not entirely clear from the evidence provided by the parties.  The Distributor Agreement does not specifically state where it was executed, although the signature page does indicate that the document was notarized by a Notary Public in New Jersey.  [Record No. 1, Attachment No. 1, Ex. A, p. 19]  However, in the affidavit attached to the plaintiff's response, Conley, the owner and president of LeafGuard of Kentuckiana, attested that he has "never conducted business in New Jersey." [Record No. 26-1]

Nevertheless, the first two factors of the test appear less important in this case where the original agreement was signed in 2003 but, according to Conley, was renewed automatically every two years until 2014.  [Record No. 16, p. 31-32]  Regarding the place of performance and the location of the subject matter, the Distributor Agreement states that the plaintiff's sales territory covers specific regions of Indiana and Kentucky.  However, the Distributor Agreement also contemplates that Englert will provide the plaintiff with some training at Englert's headquarters in New Jersey.  [Record No. 1, Attachment No. 1, Ex. A, Sec. IV(A)(ii)]

Regarding the last factor, New Jersey is Englert's state of incorporation and the location of its principal place of business.  *Id.* at p. 1.  LeafGuard of Kentuckiana, on the

other hand, is incorporated in Kentucky, and its principal place of business in located in Kentucky. *Id.*

Application of § 187 tips the balance in favor of New Jersey law. Section 187(2) of the Restatement Second provides:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2) (1971). Analysis of the significant relationship test from § 188 indicates that New Jersey does have a substantial relationship to the parties. At the very least, a reasonable basis exists for Englert, headquartered and incorporated in New Jersey, to choose New Jersey's law to govern its franchise contracts.

Finally, both parties have argued that they would prevail regardless of which state's law applies. [Record Nos. 30-1, 31] After reviewing New Jersey and Kentucky law regarding the issues raised by the plaintiff, this Court agrees that the result would likely be the same. Accordingly, application of New Jersey law would not undermine any fundamental policies inherent under Kentucky law.

Moreover, like *Abrams*, 223 F.3d at 393, this case can be distinguished from the facts in *Breeding*, 633 S.W.2d 717. The fact that both parties to the Distribution Agreement are businesses and are represented by sophisticated individuals is evidence of arms-length

- 12 -

negotiations.  Unlike *Breeding*, the Distribution Agreement's choice-of-law provision plainly articulates which state's law will apply, and the plaintiff does not suggest that it was unaware of the terms of the agreement or the choice-of-law clause in particular.

The Court rejects the plaintiff's argument that Englert somehow waived enforcement of the choice-of-law clause by waiting to assert it is unconvincing.  [Record No. 30-1]  Ten days after the plaintiff filed its Complaint, Englert removed the case to this court and filed a motion to compel arbitration the same day.  [Record Nos. 1, 1-1, and 4]  Englert had no reason to cite New Jersey law or mention the contract's choice-of-law provision before LeafGuard of Kentuckiana challenged the arbitration agreement in its response to Englert's motion.

### C.      Validity of Arbitration Agreement

A party opposing arbitration has the burden of proving that a genuine issue of material fact exists regarding the validity of the arbitration agreement.  *Simons*, 288 F.3d at 889.   LeafGuard of Kentuckina asserts that the arbitration clause in the Distribution Agreement is unenforceable because the agreement represents an adhesion contract "obtained through economic duress" and is procedurally unconscionable.  [Record No. 26, p. 6]  Additionally, the plaintiff maintains that the agreement is substantively unconscionable because it required the plaintiff to waive its right to pursue injunctive relief in addition to exemplary  and punitive damages.  *Id.* at 7.  However, because the plaintiff has not presented evidence sufficient to meet its burden of proof, the arbitration clause will be enforced.

Under New Jersey law, "[i]t is well settled that courts 'may refuse to enforce contracts that are unconscionable."  *Muhammed v. Cnty. Bank of Rehoboth Beach, Del.*, 189 N.J. 1, 15 (N.J. 2006) (quoting *Saxon Const. & Mgmt. Corp. v. Masterclean of N.C., Inc.*,

273 N.J. Super. 231, 236 (N.J. Super. Ct. App. Div. 1994)).  To prove unconscionability, a party must show "some overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms."  *Howard v. Diolosa*, 241 N.J. Super. 222, 230 (N.J. Super. Ct. App. Div. 1990).  Generally, unconscionability involves two factors: (i) procedural unconscionability and (ii) substantive unconscionability.  *Moore v. Woman to Woman Obstetrics Gynecology, LLC*, 416 N.J. Super. 30, 38-39 (N.J. Super. Ct. App. Div. 2010).

### 1.      Procedural Unconscionability

Procedural unconscionability is "unfairness in the formation of a contract."  *Sitogum Holdings, Inc. v. Ropes*, 352 N.J. Super. 555, 564 (N.J. Super. Ct. Ch. Div. 2002).   In determining whether a contract is procedurally unconscionable, courts may consider a variety of factors including the age, literacy, and lack of sophistication of the contracting parties, "hidden or unduly complex contract terms, bargaining tactics," and the "particular setting" of the contract formation process."  *Id.*  When applied to this case, these factors do not weigh in favor of a procedural unconscionability finding.

Conley testified during the hearing on the plaintiff's motion for injunctive relief that he is sixty years old and has operated two businesses for a number of years: LeafGuard of Kentuckiana and Diversified Demolition, which demolishes structures and performs other kinds of work at construction sites.  [Record No. 16, p. 30]  Conley has been operating LeafGuard of Kentuckiana for over twenty-two years.  *Id.*  In short, he is a sophisticated businessman.

- 14 -

Further, the plaintiff has failed to submit any evidence that Conley possesses any personal characteristics that prohibit or impair his ability to make wise business decisions. And the plaintiff has not offered any proof that Englert used underhanded or improper bargaining tactics to convince Conley to sign the Distributor Agreement. The Court also notes that the arbitration clause is not hidden in the contract. The provision is entitled, "Arbitration" in bold font, and the provisions that follow are not printed in particularly small font. [Record No. 1, Attachment No. 1, Ex. A, Sec. XV(A)] Nor is the arbitration agreement difficult to understand. *Id.* It clearly explains when arbitration should commence, the process for selection of an arbitrator, what rules will apply, and what damages are available. *Id.*

In support of its procedural unconscionability argument, the plaintiff offers the sworn affidavit of Conley which states, in part,

> 3.      None of the terms in the Distributor Agreement was [sic] discussed or negotiated, and Englert drafted the entirety of the Agreement. It was presented as a take-it-or-leave-it document.
>
> 4.      When the Distributor Agreement was provided to me I knew that I had to either sign the document as-is or lose the LeafGuard distributorship I'd spent ten years and hundreds of thousands of dollars growing into a reputable and profitable business.
>
> 5.      I knew that if I objected to any of the terms in the Agreement that Englert would revoke my license and distributor rights, and so I signed the document as it was presented to me.

[Record No. 26-1] Thus, the plaintiff argues that the agreement represents an adhesion contract that Conley signed under economic duress. *Id.*

Under New Jersey law, economic duress results from a "'wrongful or unlawful act or threat' which 'deprives the victim of his unfettered will.'" *Quigley v. KPMG Peat Marwick,*

- 15 -

*LLP*, 330 N.J. Super. 252, 263 (N.J. Super. Ct. App. Div. 2000) (quoting 13 *Williston on Contracts* § 1617 (Jaeger ed. 1970)).  The economic duress inquiry turns on the question of whether the pressure exerted was wrongful.  *Id.*

In *Quigley*, 330 N.J. Super. at 266, the plaintiff-employee lost his economic duress argument because he failed to demonstrate "circumstances substantially more egregious than the ordinary economic pressure faced by every employee who needs a job."  The plaintiff had also provided no proof that he was "tricked or duped into signing the agreements."  *Id.* The court further noted that the plaintiff continued to work for the defendant for twelve years after he executed the agreement.  *Id.*  Likewise, the plaintiff in this case has not demonstrated that Englert exerted any improper economic pressure on Conley.  The mere enticement of continuing to operate a LeafGuard distributorship does not constitute economic duress. Conley also continued to allow the Distributor Agreement to renew automatically for over ten years.

"[A] contract of adhesion does not mean the agreement is unconscionable and automatically unenforceable."  *Jiang v. Bldg. Materials Corp. of Am.*, 2014 WL 5431335 at *5 (N.J. Super. Ct. App. Div. Oct. 28, 2014).  Rather, the determination that an agreement amounts to an adhesion contract, "is the beginning, not the end, of the inquiry."  *Rudbart v. N. Jersey Dist. Water Supply Comm'n*, 127 N.J. 344, 353 (N.J. 1992)).  According to the New Jersey Supreme Court, a contract of adhesion is an agreement "that is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps for a few particulars."  *Id.*  In determining whether an adhesion contract is unconscionable, courts should consider: (i) the contract's subject matter, (ii) the parties' relative bargaining power, (iii) the degree of economic

compulsion that motivated the adhering party, and (iv) what public interests are affected by the contract. *Id.* at 356.

LeafGuard of Kentuckiana bases its argument on Conley's unsupported statements that the Distributor Agreement meets the definition of an adhesion contract. But assuming for the sake of argument that the Distributor Agreement is a contract of adhesion does not lead the the inevitable conclusion it is unconscionable as the plaintiff asserts. The evidence offered by the parties does not indicate that Conley was forced into signing the agreement. According to Conley's own testimony, he operates multiple businesses in the construction industry. He easily could have refused this one business venture.

This case more closely resembles *Martindale v. Sandvik, Inc.*, 173 N.J. 76 (N.J. 2002), a case involving an arbitration agreement in an employment application, than *Muhammed*, 189 N.J. 1, where a college student signed a class-arbitration waiver as part of a short-term, single advance, unsecured loan agreement. After examining the consumer transaction in *Muhammed*, the New Jersey Supreme Court found the bar to class-action lawsuits unconscionable as against public policy. 189 N.J. at 22. In *Martindale*, on the other hand, the Court upheld the agreement because "courts have held on numerous occasions that agreements to arbitrate are not violations of public policy." *Id.* at 92.

Based on the foregoing analysis, the arbitration agreement in the present case -- between two businesses, represented by sophisticated business people -- is not procedurally unconscionable.

### 2.      Substantive Unconscionability

The plaintiff also argues that the Distributor Agreement is substantively unconscionable because it required LeafGuard of Kentuckiana to forfeit its right to seek

punitive damages, exemplary damages, and injunctive relief. However, the waivers embedded in the Distributor Agreement are not substantive unconscionability as defined by New Jersey courts.

Under New Jersey law, "[s]ubstantive unconscionability 'suggests the exchange of obligations so one-sided as to shock the court's conscience.'" *B & S Ltd., Inc. v. Elephant & Castle Int'l, Inc.*, 388 N.J. Super. 160 (N.J. Super. Ct. Ch. Div. 2006) (quoting *Sitogum Holdings*, 352 N.J. Super. at 565). The plaintiff's waiver of punitive and exemplary damages is neither one-sided nor shocking to the conscience. The waiver applies to both Englert and LeafGuard of Kentuckiana. In its reply supporting the motion to compel arbitration, Englert cites *Johnson v. Wynn's Extended Care, Inc.*, No. 12-CV-00079 (RMB-KMW), 2014 U.S. Dist. LEXIS 147034 at *19-20 (D. N.J. Oct. 15, 2015), an unpublished case in which the district court in New Jersey upheld an arbitration clause that barred punitive damages. [Record No. 29] Even in its proposed sur-reply, LeafGuard of Kentuckiana did not any legal authority supporting its proposition that limitations specifically concerning punitive and exemplary damages are unconscionable. [Record No. 30-1]

The Court also rejects the plaintiff's argument that the Distribution Agreement bars it from seeking injunctive relief. Section XV(B) of the agreement specifically gives Englert the right to seek injunctive relief under certain circumstances. [Record No. 1, Attachment No. 1, Ex. A] It does not bar LeafGuard of Kentuckiana from pursuing similar remedies.[1] In summary, because the arbitration provision contained in the Distributor Agreement is not

---

[1] LeafGuard of Kentuckiana has exercised its right to seek injunctive relief from this Court.

procedurally nor substantively unconscionable, this Court will enforce the arbitration clause and grant Englert's motion to compel arbitration.

### D.    Stay

Section 3 of the FAA requires courts to stay arbitrable issues while arbitration is pending.   Because all of the plaintiff's claims against Englert are subject to binding arbitration, this Court will grant Englert's motion to the extent that it seeks a stay of those particular claims. Englert's motion to compel also requests a stay of the entire action, including claims involving others who were not parties to the Distributor Agreement. [Record No. 4]

Section 3 of the FAA "does not require a stay of proceedings as to claims that are not being arbitrated." *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, No. 11-374-JBC, 2013 WL 28067 (E.D. Ky. Jan. 2, 2013).  However, the Supreme Court has recognized that district courts have the discretion to stay claims among non-arbitrating parties pending the outcome of arbitration.  *Moses H. Cone*, 460 U.S. at 21, n. 23.   In deciding whether non-arbitrable claims should also be stayed, a district court should consider "whether [the] arbitrable claims predominate or whether the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *Rose v. Volvo Cost. Equipment N. Am., Inc.*, No. 1:05 CV 168, 2007 WL 846123 (N.D. Ohio Mar. 20, 2007) (quoting *Klay v. Pacificare Health Sys., Inc.*, 389 F.3d 1191, 1204 (11th Cir. 2004).

Defendants Leafguard of Kentucky and Chambers oppose a complete stay.  [Record No. 25]  They assert that Englert's consent to the sale of the plaintiff's distributorship was a condition precedent to the Purchase Agreement and, therefore, their claims could be resolved by motions for summary judgment.  *Id.*  LeafGuard of Kentucky and Chambers are correct

that such motions are not dependent on the outcome of the arbitration.  Thus, Englert's motion will be denied to the extent that it seeks a stay of all non-arbitrable claims. LeafGuard of Kentucky and Chambers may pursue this particular theory for summary judgment while arbitration between Englert and the plaintiff is pending.

> **E.**     **Sur-reply**

After Englert filed its reply, the plaintiff filed a motion for leave to file a sur-reply regarding the choice-of-law issue discussed above.  [Record No. 30]  The plaintiff also submitted a proposed sur-reply with its motion.  [Record No. 30-1]  The plaintiff is not entitled to a sur-reply because it could have addressed the choice-of-law issue in its response. Nevertheless, the Court has considered the sur-reply in reaching the conclusions outlined herein.

> **V.**

For the foregoing reasons, it is hereby **ORDERED** as follows:

1.     Defendant Englert Inc.'s motion to compel arbitration [Record No. 4] is **GRANTED**.

2.     Defendant Englert Inc.'s motion to stay the action pending arbitration [Record No. 4] is **GRANTED**, in part, and **DENIED**, in part.  Plaintiff LeafGuard of Kentuckiana, Inc.'s claims against Defendant Englert, Inc. are **STAYED**, pending the completion of arbitration proceedings.

3.     The plaintiff is required to prosecute all of its claims arising out of the Distributor Agreement in accordance with the terms of the arbitration provision of that document.  The claims and counterclaims between the plaintiff, Defendant LeafGuard of

Kentucky, LLC, and Defendant John Chambers remain pending in this Court until resolution of motions for summary judgment.

4.      Defendant Englert, Inc. and Plaintiff LeafGuard of Kentuckiana, Inc. are directed to file status reports concerning arbitration each sixty (60) days following the entry of this Order and upon the completion of arbitration.

5.      The Plaintiff's motion for leave to file a sur-reply [Record No. 30] is **GRANTED**.  The Clerk is directed to file the sur-reply previously tendered by Plaintiff LeafGuard of Kentuckiana Inc.  [Record No. 30-1]

This 9th day of October, 2015.

Signed By:

**_Danny C. Reeves_**  DCR

**United States District Judge**